UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN BLACK,<br><br>                              Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  20cv00772-NLS<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 16, 17]** |

Kathleen Black ("Plaintiff") brings this action under the Social Security Act, 42 U.S.C. § 405(g), and seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") based on disability under Title XVI of the Social Security Act ("the Act"), 42 U.S. C. §§ 1381 et seq.  The parties filed cross-motions for summary judgment. ECF Nos. 16, 17.  Plaintiff filed a Reply.  ECF No. 18.  After considering the papers submitted, the administrative record, and the applicable law, for the reasons set forth below, the Court **GRANTS** Plaintiff's motion for summary judgment**, DENIES**

Defendant's motion for summary judgment, and **REMANDS** to the Commissioner for further proceedings consistent with this order.[1]

### I. BACKGROUND

#### A. Procedural History

Plaintiff filed a Title II application for Social Security Disability Insurance on January 13, 2017. Administrative Record ("AR") 164. She alleged an inability to work since January 1, 2017, due to traumatic brain injury, PTSD, post-concussion syndrome, memory/cognitive issues, sensitivity to light, balance issues, vision problems, and migraines. AR 164-172, 200. The Commissioner initially denied Plaintiff's claim on April 19, 2017, AR 76, and on reconsideration on July 17, 2017. AR 85. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 17, 2018. AR 34. Plaintiff testified at the hearing and she was represented by counsel. *Id.* An impartial vocational expert also testified at the hearing. *Id*. On February 19, 2019, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff was not disabled under the Social Security Act. AR 17-33. On February 24, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for the judicial review purposes. AR 6. Plaintiff timely commenced this action in federal court.

#### B. Personal History and Medical Treatment

1. Personal History and Self-Reported Symptoms

Plaintiff was born on March 8, 1970. AR 164. She was 48 years old at the time of her hearing before the ALJ. AR 36. She has a Bachelor of Arts degree from the University of California, Irvine. *Id.* She worked for Sony as a sales manager until 2001. AR 37. She married a navy pilot in 2001 and they moved to a base overseas. *Id.* They were later divorced, but she continued working overseas until 2013 when she returned to

---

[1] The parties have expressly consented that all proceedings in this case may be heard and finally adjudicated by the undersigned magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; ECF No.10.

the United States. AR 37. Shortly thereafter, she got hit by a car. *Id.* She filed a lawsuit that settled for less than she owed in legal fees and costs. AR 38.

Plaintiff testified at the hearing that she uses a service dog because she gets disoriented and confused. *Id.* She also has a caregiver who comes to her home three days a week for a few hours in the morning to drive her to medical appointments and to do the things in the house that she cannot do. AR 38-39. She claims that she is unable to work because she has difficulty concentrating for long periods of time and she is sensitive to fluorescent lights and certain sounds. AR 40. She also has a problem with migraine headaches. AR 40, 200. Every seven to ten days she gets a "really bad one." AR 40, 42. She testified that regular Botox injections help with her headaches, but when she has bad ones, she has to lay down or stay in a dark room and sleep. AR 42.

### C. Medical Providers

#### 1. Irlen Institute

In June 2014, Plaintiff was referred to the Irlen Institute for "extreme light sensitivity" related to the injuries she suffered in 2013 when she was hit by a car, "landed on her head, and was left unconscious and bleeding for over an hour." AR 363. She underwent testing that led to a diagnosis of severe visual processing deficits and light sensitivity, a form of learning disability different from an optical problem. AR 364. Visual processing deficit is a condition where the brain can no longer accurately process and interpret visual information due to traumatic brain injury ("TBI"). *Id.*

Plaintiff's problems improved with "Irlen Spectral Filters;" however, fluorescent and bright lights still triggered nausea, dizziness, disorientation, anxiety, exhaustion and "brain fog," resulting in difficulty thinking, pulling thoughts together, attending and concentrating. Even with special filters, her ability to function was compromised and made significantly worse by being in bright rooms and rooms with fluorescent lights. *Id.*

Plaintiff was tested using the Irlen Perceptual Scale and Irlen Differential Perceptual Schedule. AR 364. Results demonstrated that she had severe processing difficulties and sensory overload. *Id.* Her scaled scores were at the top end of the severe

range for difficulties processing visual information. *Id*. Reading, copying, computer use, math calculation, studying, paper and pencil tasks, tracking moving objects, driving, night driving, performance, and ability to function were more difficult in Plaintiff's condition. AR 366.

On August 15, 2018, Plaintiff was seen again at the Irlen Institute. AR 380. Progress notes indicated that although Irlen Spectral Filters helped, Plaintiff still had the following problems: migraines, nausea, dizziness, balance and coordination, light sensitivity, noise sensitivity; cognitive symptoms, including difficulty concentrating and thinking, memory problems, and problems with speaking. *Id*. Their recommendations for her included: vestibular therapy for balance and coordination; vision reduction therapy; migraine treatments with Botox; Irlen Spectral Filters; a care giver; and a service dog. *Id.*

    2.   <u>Dr. Dupon</u>

On March 6, 2015, Dr. Dupon, a psychiatrist, diagnosed Plaintiff with cognitive and mood disorders due to traumatic brain injury. AR 395.

    3.   <u>Dr. Frishberg (Treating Neurologist)</u>

On January 1, 2016, Plaintiff began treatment with Dr. Ben Frishberg at North County Neurology Associates. AR 274. The record contains Dr. Frishberg's notes from multiple visits over nearly three years. The most notable visits are summarized below.

On April 5, 2016, Plaintiff underwent a nerve block and trigger procedure for migraines. AR 310. The doctor also requested approval for Botox. *Id*.

On June 5, 2016, progress notes indicated that Plaintiff's MRI in February 2015 showed microhemorrhage in the right anterior frontal juxtacortical region that is likely secondary to her head injury. AR 299, 311. Dr. Frishberg's assessment included chronic migraine without aura, intractable, without status migrainousus.[2] AR 311. His treatment

---

[2] Status migrainousus refers to migraine headaches that last as much as 72 hours and that are not responsive to traditional migraine treatment. *See* https://www.webmd.com/migraines-headaches/status-migrainosus-symptoms-causes-

included nerve blocks, trigger point injections, chemodenervations, Toradol, and a request for authorization for Botox injections, as Plaintiff had failed treatment with amitriptyline, nortriptyline, and propranobol. *Id.* Plaintiff experienced improvement on Botox; however, she still suffered from photophobia and motion sensitivity. AR 302. Plaintiff continued to struggle with dizziness, nausea, and optokinetic hypersensitivity since her head injury. *Id*. Notes indicated that Plaintiff may have an underlying vestibular disorder from the head injury because those symptoms had not improved along with improvement in her migraines. *Id*.

On October 6, 2016, Dr. Frishberg administered Botox to Plaintiff for chronic migraines. AR 281-282. He noted greater than seven headache days (7 HA days) a month improvement from baseline and greater than 150 hours of HA improvement from baseline. AR 282.[3]

On December 14, 2016, Plaintiff was seen again for migraines. AR 283. Progress notes indicated that Botox reduced the severity of Plaintiff's migraines; however, there was no change in headache character. *Id.* Plaintiff still experienced moderate to severe pain with associated photophobia, phonophobia, and nausea. AR 287. Notes documented her headache intensity prior to Botox as 8/10 on a pain scale with a reduction to 5-7/10 post Botox. The headache duration prior to Botox was 4-24 hours; post Botox was four hours. AR 285. However, at the time of that visit Plaintiff was experiencing a severe migraine with a 10/10 on a pain scale so Dr. Frishberg also administered Toradol and Phenergan IM. AR 286.

Progress notes from February 13, 2017, reported that Plaintiff's headaches as improved, with only 1-3 per month. AR 292-294. She did complain of blurry vision in her left eye since her last Botox treatment. AR 292.

On May 18, 2017, records noted that Plaintiff did vestibular exercises at home and

---

treatment.
[3] Plaintiff's "baseline" prior to Botox was a migraine headache every day, 30/30. AR 279.

had less nausea and phonophobia. AR 340-41. Plaintiff was also less sensitive to outside light, but still sensitive to fluorescent lights. *Id*. She experienced good benefits with migraines from Botox. *Id*. At that time, her Botox injections were 11 weeks apart. *Id.*

On June 8, 2017, Plaintiff came in for her regular Botox treatment. AR 349. She reported experiencing a flare up of headaches two weeks before the treatment. *Id*. Her headache frequency was three to four days a month, which was an 85 percent overall improvement. *Id*. Plaintiff's headache intensity was usually moderate to severe, and headaches lasted more than four hours. *Id*.

On October 23, 2018, Plaintiff saw Dr. Frishberg for a Botox treatment. At that time, he noted a marked improvement to four to six headache days per month, down from her baseline of thirty days a month. However, he also noted those headaches were moderate to severe in intensity. AR 557.

On November 28, 2018, Dr. Frishberg completed a form "Headaches Medical Source Statement." AR 559-563. Dr. Frishberg diagnosed Plaintiff with post traumatic migraine with severe intensity. AR 559. He identified the clinical signs and symptoms associated with Plaintiff's headaches as nausea, phonophobia, photophobia, throbbing pain, mood changes, exhaustion, malaise, impaired appetite, and avoidance of activity. *Id*. Dr. Frishberg further noted the approximate frequency of the migraines at five headaches per month while on Botox, and the approximate duration as four hours. AR 560. He opined that Plaintiff's headaches could reasonably be explained by a history of head injury. *Id*. He noted that alcohol, bright lights, lack of sleep, noise, and stress triggered Plaintiff's headaches. *Id*. He further indicated that bright lights, coughing, straining/bowel movement, moving around, and noise made Plaintiff's headaches worse. *Id*. Lying down, taking medication, and being in a quiet place and a dark room made Plaintiff's headaches better. AR 561. Dr. Frishberg opined that emotional factors contributed "somewhat" to the severity of plaintiff's headaches. *Id*. He candidly stated he did not know to what degree Plaintiff can tolerate work stress. *Id*. He noted she takes her prescribed medications and her impairments have lasted or can be expected to last at

least twelve months. *Id.*

Dr. Frishberg also opined that Plaintiff's headaches caused significant interference with her activities during the day. AR 562. During a headache, she would need an unscheduled four-hour break from working. *Id*. She would likely be "off task" five percent of a typical workday. *Id*. He noted Plaintiff's would have "good days" and "bad days," and she would be absent from work about two days per month. AR 563. Finally, he observed Plaintiff's symptoms had been present for the past four years and were much worse before Botox. *Id.*

    4.    <u>Dr. Thomas Schweller (Consulting/Examining Neurologist)</u>

Dr. Schweller examined Plaintiff on April 6, 2017. AR 330. The history portion of his report indicates that Plaintiff had participated in several treatment programs at Scripps Encinitas Outpatient Brain Injury Day Program with follow-up classes at the brain injury program at Scripps College. AR 330. He reviewed Plaintiff's MRI scans from February 13, 2015, which showed evidence of microhemorrhages in the right anterior frontal brain and some diffuse cortical atrophy, along with left paramedian pons microhemorrhages and subcortical white matter changes in the right frontal lobe. *Id*. He indicated that those findings were consistent with her prior history of brain trauma. *Id*. Her complaints at the time of his examination were lapses of memory and attention and increased light sensitivity for which she uses Irlen lenses. *Id*. He also noted that at times she has increased sound problems. On occasion, she also has problems with balance. *Id*.

Dr. Schweller's physical examination showed Plaintiff could ambulate without an assistive device, but she had moderate difficulty with tandem walking. AR 331. Plaintiff had easy laughability during the examination, which is consistent with pseudobulbar condition. *Id*. Plaintiff was wearing Irlen lenses due to marked light hypersensitivity and had increased discomfort with optokinetic testing in both directions. *Id*. Her motor strength was 5/5 in both the upper and lower extremities and her reflexes were normal. *Id.*

Dr. Schweller's impressions included closed head injury with traumatic brain

injury, with cognitive and mood impairment; balance impairment secondary to central nervous system abnormalities; and Irlen syndrome with scotopic hypersensitivity. AR 331-332.

In terms of Plaintiff's "Functional Capacity" Dr. Schweller indicated:

> From a physical standpoint, there would be no specific limitations in lifting, bending stopping, squatting, kneeling, or crawling. She should avoid unprotected heights and exposure to moving machinery. Her main difficulties are residuals of her traumatic brain injury. There appeared to be some problems with lapses in memory, attention, focus, and probably executive skills and some pseudobulbar features. *Id*. The exact degree and nature of her cognitive limitations are best defined with formal neuropsychometric testing. AR 332.

Notably absent from Dr. Schweller's Report is any discussion of migraine headaches, even though at the time of his examination, Plaintiff was regularly treating with Dr. Frishberg for her migraines. AR 349.

5. <u>Dr. Gleason and Dr. Taylor Holmes (State Agency Consultants)</u>

Dr. Gleason, the state agency physician on initial review of Plaintiff's application for benefits, is a plastic surgeon who reviewed Plaintiff's medical records and determined she was not disabled from working. AR 57-62. Dr. Taylor-Holmes, an internal medicine doctor, similarly reviewed the records on Plaintiff's request for reexamination. AR 63-74. Neither is a neurologist. Their stated opinions regarding Plaintiff were directed to limitations on physical exertion and exposure to cold, heat, noise, and hazards. They did not address migraine headaches:

> [C]laimant could frequently climb ramps and stairs but never climb ladders, ropes, and scaffolds . . . could frequently stoop, balance, kneel, and crouch . . . should avoid concentrated exposure to extreme cold, extreme heat and avoid even moderate exposure to noise and hazards. AR 27, 70-71.

### D. Vocational Expert's Testimony

Vocational Expert ("VE") John P. Kilcher testified at the hearing. AR 44. The ALJ posed the following hypothetical to the VE:

      a hypothetical claimant age 46 as of the protected filing date with 16 years of education, no past relevant work at SGA. It is opined that this hypothetical claimant can lift and carry 20 pounds occasionally, ten pounds frequently, can stand or walk for six hours out of eight, sit for six, can occasionally climb stairs and ramps, never ropes, ladders and scaffolds, should avoid moderate exposure to loud noise and all exposure to unprotected heights and moving and dangerous machinery.

Given those restrictions, the VE testified that there are examples of work the hypothetical claimant could perform, such as a garment sorter, garment folder, and bagger, all classified as light, unskilled work, and all with thousands of positions available nationwide. AR 44-45.

    Plaintiff's attorney then modified the ALJ's hypothetical to include three to four headaches a month, with pain intensity being four to six, that last up to four hours. AR 45. Accordingly, the hypothetical claimant would have to either leave work for three to four hours during those days, or not show up to work. *Id*. Her attorney then asked whether the previously identified jobs would be sustainable. *Id*. The VE testified: "No. They would not." *Id.*

## II. THE ALJ DECISION

### A. The Sequential Process

    To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months. 42 U.S.C. §§ 423(d), 1382(c)(a)(3). The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

    At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b). If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a

combination of impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(c). If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* §§ 404.1520(a)(4)(iii), 416.920(d). If the applicant's impairment meets or equals a listing, he or she must be found disabled. *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e). Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(f). If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

### B. Substance of the ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 11, 2017, the date of her application for benefits. AR 22. At step two, the ALJ determined Plaintiff's history of traumatic brain injury with residuals of migraine headaches constituted a severe impairment; however, Plaintiff's neurocognitive disorder "does not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and is therefore non-severe." AR 22-24. At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. AR 24. Specifically, the ALJ found that Plaintiff did not meet or medically equal Listing 11.18, which required either a disorganization of motor function in two extremities resulting in extreme limitation, or a marked limitation in physical functioning in understanding, remembering, or applying information; interacting with others, concentrating, persisting,

or maintaining pace; or adopting or managing oneself. *Id*.

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). *Id*.

> The claimant can lift and carry [twenty] pounds occasionally and ten frequently. The claimant can stand and/or walk for six hours in an eight-hour workday. The claimant can sit for six hours in an eight-hour workday. She can occasionally climb ramps and stairs but should never climb ladders, ropes, and scaffolds. She should avoid moderate exposure to loud noise and all exposure to unprotected heights and moving and dangerous machinery. *Id.*

In making his RFC assessment, the ALJ noted he had considered all of Plaintiff's symptoms as well as the opinion evidence. *Id.* He did not, however, include the additional workplace limitations as determined by Dr. Frishberg.

At step four, the ALJ determined that Plaintiff had no past relevant work. AR 28. At step five, considering the claimant's age, education, work experience, and residual functional capacity, the ALJ found that a significant number of jobs existed in the national economy that Plaintiff could perform such as garment sorter, garment folder, and bagger. AR 28. As such, the ALJ concluded Plaintiff is not disabled as defined in the Social Security Act. AR 28-29.

### III.  LEGAL STANDARD OF REVIEW

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court will set aside a denial of benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted). It is a "highly deferential" standard

of review. *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009). However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted). If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Molina*, 674 F.3d at 1111. It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193. Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Molina*, 674 F.3d at 1121.

## IV.   DISCUSSION

Plaintiff contends the ALJ erred by "giving little weight" to the opinion of her treating physician, Dr. Frishberg, regarding her workplace limitations. AR 26-27. Dr. Frishberg opined that due to her migraine headaches, plaintiff would need a four-hour unscheduled break from work once a month; that she would be "off task" five percent of the workday and would miss about two days of work per month. AR 562-563. According to plaintiff, the ALJ should have given Dr. Frishberg's opinion controlling weight under the then-applicable "treating physician rule." Had he done so, the vocational expert would have opined she is disabled. AR 44-45.

### A.   The Treating Physician Rule

For Social Security applications filed before March 27, 2017,[4] the medical opinion

---

[4] On January 18, 2017, the SSA revised the regulations that apply to evaluation of medical evidence, effectively abolishing the "treating physician rule" for cases filed on or after March 27, 2017. This means that an ALJ no longer must assign a certain weight

of a treating physician is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in claimant's medical record. *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 CFR §§ 404.1527(c)(2)). Because Plaintiff's application was filed on January 17, 2017, before the rule change, the treating physician rule applies here.

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. *Id.* 404.1527(2)-(6); *Trevizo*, 871 F.3d at 675. Generally, the longer a treating source has treated a claimant, the more weight the ALJ should give to the treating source's opinion. *Id.* Further, the more knowledge a treating source has about Plaintiff's impairments, the more weight his/her opinion deserves. *Id.* The ALJ should consider the treatment the source provided, along with examinations and testing performed or ordered. *Id.* A treating source's opinion deserves more weight if it is supported by the relevant evidence, such as medical signs and laboratory findings. *Id.* The ALJ should also consider the quality of explanations the source provides for his/her opinion. *Id.* The failure to consider these factors, by itself, constitutes reversible error. *Id.* at 676.

Second, the ALJ must provide reasons for discounting the treating physician's opinion. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Id.* at 675. When a treating physician's opinion is contradicted by another physician, the ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion,

---

to a medical practitioner's opinion. Rather, ALJs are now to "consider" the "persuasiveness" of opinions from all medical sources. 20 C.F.R. § 1520c(a).

supported by substantial evidence. *Id.* The ALJ can meet this burden by setting out a thorough summary of the facts and the conflicting medical evidence, stating his or her interpretations and conclusions, and then making findings. *Revels*, 874 F.3d at 654.

### B. The ALJ Erred in Rejecting the Opinion of Dr. Frishberg

In his one paragraph discussion of Dr. Frishberg's opinion, the ALJ stated:

> As for the opinion evidence, in November 2018, Ben Frishberger (sic), M.D., completed a headache medical source statement on the claimant's behalf. Dr. Frishberger opined the claimant would need a four-hour unscheduled break once a month. He opined the claimant would be off task five percent of the workday and would miss about two days of work per month. (Ex. 11F). The undersigned gives **little weight** to the opinions of Dr. Frishberger, as they are inconsistent with the objective medical record as a whole. As discussed above, the objective physical examinations and testing of the claimant showed she was not as limited as Dr. Frishberger opined. (Ex.1F, pgs. 16-18, 22-26; 3F; 10F, pgs. 16, 24, 39, 44, 75). The last examination he performed on September 12, 2018 resulted in completely normal findings. *Id*. On his last visit of October 23, 2018, Dr. Frishberger noted in his records "marked improvement," 85 percent overall. *Id*. (Ex.10F, pg. 80). The treatment notes clearly do not support his statement of November 28, 2018, concerning her workplace limitations. (Ex. 11F). Further, Dr. Frishberger did not identify the objective medical evidence he relied upon in rendering his opinion.

AR 26 (emphasis added).

The ALJ's rejection of Dr. Frishberg's opinion was error. First, he erred by failing to consider all the factors he was required to consider in assigning less than controlling weight to that opinion. Specifically, there is no indication that he considered: (1) the length of the treating relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, or the specialization of the physician. 20 C.F.R. 404.1527(C)(2)-(6). The failure to consider these factors is error. *Trevizo*, 871 F.3d at 676. Dr. Frishberg is a specialist in neurology. He treated Plaintiff for migraine headaches on at least ten occasions from January 2016 through October 2018. AR 270-320, 333-351, 478-558. He administered nerve blocks, trigger point injections and a variety of medications to treat her headaches, including Botox, amitriptyline, propranolol

and Toradol.  AR 346.  His treatment regimen proved helpful but did not eliminate her migraine headaches altogether.  She continued to suffer migraines four to six days a month with moderate to severe intensity even after treatment.  AR 567.

Next, the ALJ did not give "specific and legitimate reasons" for rejecting Dr. Frishberg's opinion, let alone "clear and convincing reasons that are supported by substantial evidence." *Bayless v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  In his opinion, the ALJ cites to two visits with Dr. Frishberg as not supporting the limitations he assessed for Plaintiff.  First, on the September 12, 2018 visit, the ALJ states that the visit resulted in "completely normal findings."  AR 27.  On review, while the record for this visit does indicate that Plaintiff's migraines were "doing well at this time," the notes acknowledge that it is usually during the last two weeks between Botox treatments when "headaches begin to peak again."  AR 548.  The visit notes also recorded that Plaintiff still had issues with communication and comprehension, even though there were "short periods where she almost feels back to baseline," and fluorescent light and noise still bothers her.  *Id.*  Thus, it is not supported that the findings are "completely normal" on this visit.  Second, the ALJ stated that the visit on October 23, 2018 resulted in "marked improvement" of 85% overall.  AR 27.  However, the notes still indicate that this means 4 to 6 headache days a month, of a moderate to severe intensity that last more than 4 hours each time.  AR 557.  Rather than not supporting Dr. Frishberg's November 28, 2018 statement, this is actually entirely consistent with that statement, where Dr. Frishberg noted that Plaintiff has 5 headaches per month on Botox that lasts 4 hours.  AR 560.  Based on this, Dr. Frishberg opined that Plaintiff would therefore need an unscheduled break of 4 hours about once a month and would be absent from work "about two days per month."  AR 562-63.

Further, in rejecting Dr. Frishberg's opinion, the ALJ assigned "significant weight" to the opinion of  consulting/examining neurologist, Dr. Thomas Schweller, who stated with regard to limitations that "claimant should avoid unprotected heights and exposure to moving machinery."  AR 27.  But Dr. Schweller made no comment about the extent to

which recurrent migraine headaches might limit Plaintiff's ability to work so he does not expressly contradict Dr. Frishberg.  Additionally, the ALJ did not adopt all of Dr. Schweller's opinions as he noted "the objective physical examinations testing of the claimant showed that she was more limited than Dr. Schweller opined."  AR 27.

Moreover, the state agency physicians, Dr. Gleason and Dr. Taylor-Holmes, do not specialize in neurology and neither examined the plaintiff, nor addressed her migraine headaches in their reports.  The ALJ gave partial weight to the opinions of these physicians[5] as they were "mostly consistent with the medical records," but he similarly disregarded their opinions to the extent they support a residual functional capacity greater than light exertion.  AR 27.

But, even if the opinions of Dr. Schweller and the state agency physicians were properly viewed as contradicting Dr. Frishberg, the ALJ still must articulate specific and legitimate reasons supported by substantial evidence for discounting the treating physician's opinion.  *Trevizo*, 871 F.3d at 676.  This he did not do.

Beginning with the medical evidence, the ALJ states that Dr. Frishberg 's opinion "is inconsistent with the objective medical record as a whole," and "not supported by his treatment notes," and further that he does not identify the objective medical evidence on which he relies.  The record, however, does not support those conclusions.  Throughout his chart notes Dr. Frishberg observes that plaintiff has the clinical signs and symptoms associated with migraine headaches such as nausea, phonophobia, photophobia, throbbing pain, mood changes, exhaustion, malaise, impaired appetite, and avoidance of activity.  AR 279, 284, 288, 293, 298, 294, 298, 308, 330-331, 492-493, 500-501, 515, and 559.  Because migraine headaches cannot be proved with laboratory tests this is the

---

[5] These doctors opined the claimant could frequently climb ramps and stairs but never climb ladders, ropes, and scaffolds.  They opined the claimant could occasionally crawl but could frequently stoop, balance, kneel, and crouch.  They opined the claimant should avoid concentrated exposure to extreme cold, extreme heat and avoid even moderate exposure to noise and hazards.  AR 27.

16

kind of objective evidence that is used to support limitations due to migraines. *See, e.g.*, *Needham v. Commissioner of Social Security*, 2017 WL 4052184, at *11 (D. Or. August 8, 2017); *Mehrnoosh v. Astrue*, 2011 WL 2173809, at *7 (D. Or. June 2, 2011) (migraines are not susceptible to detection and quantification by laboratory testing or medical imaging.); *Hua v. Astrue*, 2009 WL 524991, *4 n. 2 & 4 (D. Colo. 2009) ("[W]hile laboratory tests cannot prove the existence of migraine headaches, there are medical signs which should be viewed as 'objective evidence,'" such as "nausea, photophobia, dizzy spells" and "impaired sleep[.]").

Here, the ALJ discounted Dr. Frishberg's opinion even though Plaintiff had all the telltale signs of migraine headaches and a history of a traumatic brain injury that explained the onset of the headaches. He treated her for nearly three years with a variety of medications for her migraines, some of which proved more successful than others. None eliminated her symptoms altogether. The ALJ noted her objective evidence of improvement with Botox. However, medical notes suggesting improvement should be viewed cautiously: "that a person . . . makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in the workplace." *Garrison*, 795 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). Despite her improvement with Botox, Dr. Frishberg opined she would continue to experience migraines on average of five per month with a duration of approximately four hours. AR 559-563. His conclusion that she would need one unscheduled break from work for four hours and would have to be absent from work for two days a month (AR 563) is supported by objective evidence in the record and is not inconsistent with the other objective evidence in the record that documents her physical abilities and limitations when she is not experiencing a migraine headache. Therefore, the ALJ 's rejection of that Dr. Frishberg's opinion was error.

  **C.**   **The ALJ Improperly Discounted Plaintiff's Assertions Regarding the Severity of Her Symptoms**

The ALJ must engage in a two-step analysis in determining how much to credit the

claimant's symptom testimony.  First, the claimant must show that the impairment can be expected to cause some degree of pain, or other symptoms alleged, and second, if there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering clear and convincing reasons for doing so. *Trevizo*, 871 F.3d at 678 (citing *Garrison,* 759 F.3d at 1014-15).  This is the most difficult standard to meet in Social Security cases.  *Id.*

In her applications and in her hearing testimony, Plaintiff alleged that she is significantly impaired by chronic migraine headaches.  AR 40.  She testified that even with Botox she has bad headaches every seven to ten days.  *Id.*  When she gets a bad headache, it usually lasts all day unless she has a place to lie down in a dark room and try to sleep.  AR 42.

The ALJ found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  As discussed above, the claimant's activities of daily living do not support the subjective complaints by claimant. (Exs. 5E; 2F).

AR 26.  Exhibit 5E is a Report from Plaintiff's Caregiver, Julio Palan.  Exhibit 2F is a report from a consulting psychologist, Dr. Ted Shore.  Both observe that Plaintiff's activities of daily living include taking care of her personal hygiene, some chores in the house and yard, and attending therapy.  She generally does not go out of the house without her caregiver or service animal.  AR 225-233, 323.  An ALJ may consider a claimant's activities of daily living (ADLs) in determining whether those activities contradict her testimony about her symptoms or functional limitations.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2017).  But, in this case the ALJ's finding is completely unsupported, other than his conclusory statement that her symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in this decision." AR 26.  Although Plaintiff testified that she was severely limited while experiencing a bad migraine, she did not say she was precluded from those same activities while not experiencing a migraine.  As such, the ALJ's conclusory statement about Plaintiff's ADLs being inconsistent with her symptoms and functional limitation testimony falls short of the "clear and convincing" standard.  *See Needham*, 2017 WL 4052184 at \*7; *Orn,* 495 F.3d at 639.

## IV. DISPOSITION

Where the ALJ denies benefits and the court finds error, ordinarily, the case must be remanded to the agency for further proceedings before directing an award of benefits. *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Triechler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090 1099 (9th Cir. 2014)).  However, where the record is fully developed and the ALJ has failed to provide legally sufficient reasons for rejecting a medical opinion or claimant testimony, and if the evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, the court may remand for an award of benefits.  *Trevizo*, 871 F.3d at 683 (citing *Garrison*, 759 F.3d at 1019-1020). "The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)

Here, the record is extensive.  It totals 563 pages and documents the treatment notes and examining notes of at least six physicians and psychologists.  The record also contains plaintiff's testimony at the hearing before the ALJ and her responses to numerous questionnaires about her physical and mental limitations.  Dr. Frishberg's opinion is fully developed and supported by notes of his nearly three years of treatment relationship with the Plaintiff.  As for the second factor, as discussed above, the Court finds that the ALJ failed to provide legally sufficient reasons to reject Dr. Frishberg's opinion.  Finally, the VE answered "no" when asked if a hypothetical claimant would be employable if she needed an unscheduled break of four hours one day a month and two days off work a month as opined by Dr. Frishberg.  In other words, if Dr. Frishberg's

opinion was credited as true, the ALJ would be required to find Plaintiff disabled.  Thus, having found the test met, the court credits Dr. Frishberg's opinion as true and finds it appropriate to award benefits.  *Trevizo*, 871 F.3d at 683; *Garrison*, 759 F.3d at 1019-1020.

Accordingly,  the Court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **REMANDS** the case to the Commissioner for calculation and payment of benefits.

**IT IS SO ORDERED.**

Dated:  February 8, 2022

Hon. Nita L. Stormes
United States Magistrate Judge